No. 23-1084

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

_____

HOLLIS ANN WHITSON, as guardian ad litem for Peatinna Biggs,

*Plaintiff-Appellant,*

v.

THOMAS HANNA, et al.

*Defendants-Appellees.*

_____

On Appeal from the U.S. District Court for the District of Colorado
The Honorable, Daniel D. Domenico, Judge Presiding
No. 1:18-cv-02076-DDD-SKC

_____

## BRIEF OF RIGHTS BEHIND BARS, THE NATIONAL POLICE ACCOUNTABILITY PROJECT, THE SOUTHERN CENTER FOR HUMAN RIGHTS, AND THE MACARTHUR JUSTICE CENTER AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL

_____

Jessica Ring Amunson
Mary Marshall
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, D.C. 20001
Tel: (202) 639-6865
jamunson@jenner.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

INTEREST OF AMICI CURIAE ............................................................1

SUMMARY OF ARGUMENT ...............................................................3

ARGUMENT .....................................................................................6

I.    The District Court's Decision Relied on the Flawed Assumption that Sexual Violence Is a Private Matter. ...............................................6

II.   This Court Should Reject the Antiquated and Pernicious Notion that Sexual Violence Is a Private Matter. .............................................8

      a.    Construing Sexual Violence as a Private Matter Is Contrary to Modern Law. ...................................................................8

      b.    Sexual Violence Is a Particularly Public Matter In Arenas of Public Trust, Such as in Prisons and Jails. ..........................11

III.  When Properly Construed as an Exercise of Power, Sexual Violence Fits Within the Requirements of *Monell* Liability. ......................14

CONCLUSION ................................................................................17

# TABLE OF AUTHORITIES

**CASES**

*Allen v. Zavaras*, 430 F. App'x 709 (10th Cir. 2011) ...............................................13

*Bennett v. Pippin*, 74 F.3d 578 (5th Cir. 1996)...................................................16, 17

*Bledsoe v. Board of County Commissioners*, 501 F. Supp. 3d 1059 (D. Kan. 2020), *aff'd in part, rev'd in part sub nom. Bledsoe v. Carreno*, 53 F.4th 589 (10th Cir. 2022) ...............................................................16

*Byers v. Works*, No. 22-7054 (10th Cir., filed Dec. 19, 2022) ..................................3

*Farmer v. Brennan*, 511 U.S. 825 (1994).......................................................5, 12, 13

*Hovater v. Robinson*, 1 F.3d 1063 (10th Cir. 1993) ................................................13

*Keith v. Koerner*, 843 F.3d 833 (10th Cir. 2016)....................................................13

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015) .......................................................12

*Lance v. Morris*, No. 19-7050, 2021 WL 162343 (10th Cir. Jan. 19, 2021) ......................................................................................................3

*Liebson v. New Mexico Corrections Department*, 73 F.3d 274 (10th Cir. 1996) ................................................................................................. 12-13

*Monell v. Department of Social Services*, 436 U.S. 658 (1978).............................14

*Patrick v. City of Overland Park*, 937 F. Supp. 1491 (D. Kan. 1996) ...................16

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) .......................................14, 15

*Ramos v. Lamm*, 639 F.2d 559 (10th Cir. 1980)......................................................13

*Simmons v. Uintah Health Care Special District*, 506 F.3d 1281 (10th Cir. 2007) ....................................................................................................14

*Starrett v. Wadley*, 876 F.2d 808 (10th Cir. 1989) .................................................14

*Verdecia v. Adams*, 327 F.3d 1171 (10th Cir. 2003) ..............................................13

## STATUTES

Colo. Rev. Stat. § 18-7-701 .....................................................................11

## OTHER AUTHORITIES

Kim Shayo Buchanan, *Beyond Modesty: Privacy in Prison and the Risk
of Sexual Abuse*, 88 Marq. L. Rev. 751 (2005) ...................................10

Susan Hazeldean, *Privacy as Pretext*, 104 Cornell L. Rev. 1719
(2019) .............................................................................................. 8-9

Jessica Klarfeld, *A Striking Disconnect: Marital Rape Law's Failure to
Keep Up with Domestic Violence Law*, 48 Am. Crim. L. Rev. 1819,
1826 (2011) ...................................................................................9, 10

Melissa A. Kowalski et al., *An Analysis of Statutes Criminalizing
Correctional Officer Sexual Misconduct with Inmates*, 100 Prison J.
126 (2020) ...........................................................................................11

Press Release, Dep't of Justice, *Two More Dublin Federal Correctional
Officers to Plead Guilty to Sexually Abusing Multiple Female
Inmates* (July 14, 2023), https://www.justice.gov/usao-ndca/pr/two-
more-dublin-federal-correctional-officers-plead-guilty-sexually-ab
using-multiple ....................................................................................11

Emily J. Sack, *Is Domestic Violence a Crime?: Intimate Partner Rape
as Allegory*, 24 St. John's J. Legal Comment. 535 (2010) ...................9

Katherine M. Schelong, *Domestic Violence and the State: Responses to
and Rationales for Spousal Battering, Marital Rape & Stalking*, 78
Marq. L. Rev. 79 (1994) .......................................................................9

Elizabeth M. Schneider, *The Violence of Privacy*, 23 Conn. L. Rev. 973
(1991) ....................................................................................................9

Reva B. Siegel, *"The Rule of Love": Wife Beating as Prerogative and
Privacy*, 105 Yale L.J. 2117 (1996) ...............................................8, 10

Jeannie Suk, *Criminal Law Comes Home*, 116 Yale L.J. 2 (2006) ..........................9

## INTEREST OF AMICI CURIAE[1]

**Rights Behind Bars (RBB)** is a non-profit legal advocacy organization working alongside incarcerated people to challenge the cruel and inhumane conditions of confinement. RBB advocates for people in prison and jail to live in humane conditions and contributes to a legal ecosystem in which such advocacy is more effective. RBB seeks to create a world in which people in prison do not face large structural obstacles to effectively advocating for themselves in court. RBB helps incarcerated people advocate for their own interests more effectively and through such advocacy push towards a world in which people in prison are treated humanely.

RBB has a strong interest in this case. RBB and its clients regularly litigate and file *amicus* briefs in cases that involve sexual violence against incarcerated individuals. Similarly, RBB is regularly involved in cases that implicate the reach of *Monell* liability and the extent to which the decisions of final policy makers can be imputed onto municipalities.

---

[1] No counsel for a party authored this brief in whole or in part; and no person or entity, other than amici and their counsel, made a monetary contribution intended to fund the preparation and submission of this brief.

1

The **National Police Accountability Project (NPAP)** was founded in 1999 by members of the National Lawyers Guild to address misconduct by law enforcement officers through coordinating and assisting civil-rights lawyers. NPAP has approximately 550 attorney members practicing in every region of the United States, including dozens of members that represent clients who have been harmed by the direct actions of law enforcement final policymakers.

Every year, NPAP members litigate the thousands of egregious cases of law enforcement abuse that do not make news headlines as well as the high-profile cases that capture national attention. NPAP provides training and support for these attorneys and resources for non-profit organizations and community groups working on police and correction officer accountability issues. NPAP also advocates for legislation to increase police accountability and appears regularly as amicus curiae in cases, such as this one, presenting issues of particular importance for its members and their clients.

The **Southern Center for Human Rights** (SCHR) is a nonprofit law firm dedicated to advancing equality, dignity, and justice for people impacted by the criminal legal system. Through litigation and advocacy, SCHR has worked for over 45 years to defend the civil and human rights of incarcerated people, ensure humane conditions of confinement in jails and prisons, and end degrading law enforcement practices. In pursuit of those aims, SCHR has brought class action lawsuits, issued

2

investigative reports, and pressed for legislative reforms on behalf of indigent persons.

**The Roderick and Solange MacArthur Justice Center** (RSMJC) is a public interest law firm founded in 1985 by the family of J. Roderick MacArthur to advocate for human rights and social justice through litigation. RSMJC attorneys have led civil rights battles in areas including the treatment of incarcerated people, law enforcement abuse, and ensuring accountability for egregious actions by police, correctional officials, and other jail and prison staff. To this end, RSMJC has served as merits counsel, amicus counsel, or amicus curiae in numerous cases around the country related to the reach of *Monell* liability, including in the Tenth Circuit. *See Lance v. Morris*, No. 19-7050, 2021 WL 162343 (10th Cir. Jan. 19, 2021). It has also been involved in cases in this Circuit and elsewhere challenging sexual abuse by law enforcement. *See Byers v. Works*, No. 22-7054 (10th Cir., filed Dec. 19, 2022). As such, RSMJC has a strong interest in the outcome of this case.

## SUMMARY OF ARGUMENT

Peatinna Biggs was under the care of the Sedgwick County Jail when she was falsely imprisoned and brutally sexually assaulted by the final policymaker responsible for the protection of those incarcerated in the jail: then-Sheriff Thomas Hanna. Ms. Biggs, an adult living with an intellectual disability, had no ability to fight back or run when this assault occurred. Had she done so, she would have been

3

subjected to further punishment for assaulting an officer or fleeing from incarceration. Indeed, Sheriff Hanna threatened Ms. Biggs that, if she informed anyone about the attack, she would spend the rest of her life in prison.

Yet when Ms. Biggs brought a lawsuit against the County attempting to hold it accountable for the decisions of its final policymaker, the district court dismissed her claims against the county on the grounds that Sheriff Hanna had been acting beyond his policymaking authority when he falsely imprisoned and sexually assaulted Ms. Biggs. The lower court's dismissal relied on the antiquated notion that sexual assault is a purely "personal" matter. This Court should reject that pernicious idea.

There is nothing private or personal about a sheriff sexually assaulting an incarcerated person in the course of performing his duties as a law enforcement officer. To be sure, Sedgwick County is not the first defendant to argue that sexual assault is a "private" matter; this logic has been employed in an attempt to shield domestic abusers from legal liability. But the district court's conclusion that Sheriff Hanna's assault was "private" is counter to the reality of sexual violence and modern law. Sexual violence is just that: violence. It is motivated by the same desire to overpower and control that motivates any violent attack by a law enforcement officer. Sheriff Hanna's act of violence against Ms. Biggs did not become "private"

4

because it involved digital penetration rather than a punch to the stomach. In short, sexual assault is physical assault and should be treated as such.

The district court's reasoning also ignores the public nature of Sheriff Hanna's conduct. This Court has long established, pursuant to Supreme Court precedent, that prison officials have a public and constitutional obligation to protect incarcerated persons from violence—including sexual assault. This duty arises exactly because prison officials "strip[] [incarcerated persons] of virtually every means of self-protection and foreclose[] their access to outside aid." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). When prison officials like Sheriff Hanna attack incarcerated people like Ms. Biggs, that is an egregious violation of that public trust. And such an attack is enabled by the fact that sheriffs have significant control over the lives of incarcerated people by virtue of their final policymaking authority.

When his assault of Ms. Biggs is properly understood as a violation of Sheriff Hanna's public duty enabled by his authority as a law-enforcement officer, it is clear that municipal liability must attach. The fact that Sheriff Hanna's assault of Ms. Biggs was motivated by his own sexual interest and did not advance any public ends is legally irrelevant. It does not mean that Sheriff Hanna's conduct falls outside of his law-enforcement function. Any so-called "private" or "personal" motive is irrelevant because Sheriff Hanna's use of his public authority and power as Sheriff

5

is exactly what placed him in a position to assault Ms. Biggs. That alone is enough to justify municipal liability under the relevant precedent.

## ARGUMENT

### I.   The District Court's Decision Relied on the Flawed Assumption that Sexual Violence Is a Private Matter.

The misconception that sexual violence is a private matter is central to this appeal. The district court's decision to dismiss Ms. Biggs's § 1983 claims against the municipal defendants hinged entirely on its determination that sexual assault is necessarily "personal," and thus outside the scope of an official's policymaking authority. *See* March 2023 Op. at 9 n.6. Although "transportation of prisoners is within the realm of the county sheriff's policymaking authority," the court reasoned, "Entity Defendants are not being sued because Mr. Hanna transported Ms. Biggs; they are being sued because he sexually assaulted her." *Id*. at 8. According to the district court, this assault fell outside of Sheriff Hanna's policymaking authority because "[a]n official acts wholly outside his grant of authority when he misuses his power to advance a purely personal agenda." *Id.* at 9 (internal quotation marks omitted). And Sheriff Hanna's decision to sexually assault Ms. Biggs was merely an attempt to "advance a purely personal agenda." *Id*. (quotation marks omitted). As a result, the district court found that municipal defendants could not be held liable for Sheriff Hanna's assault. *Id.*

The district court's decision repeatedly emphasizes the—again, erroneously—private nature of the assault: The court asserted that a city is not liable when an individual officer commits "private, rather than public, acts of sexual harassment." *Id*. at 9 n.6 (quotation marks omitted). And that a policymaker's acts of sexual harassment are "private rather than official acts" and "personal in nature without any indicia of being officially sanctioned or ordered." *Id*. (quotations marks omitted); *see also id*. (noting that a county is not liable for a policymaker sheriff's rape of a minor because it was not a matter of official business but rather a misuse of power to advance a private agenda).

The district court concluded such despite its recognition that "Mr. Hanna's position of power was an enabling factor in his assault on Ms. Biggs." *Id*. at 9. The court also acknowledged the unfairness of its ruling, admitting that "local governments and other municipal entities can often escape liability for the misdeeds of individuals acting on their behalf" and, as a result, "individuals, including Ms. Biggs here, end up bearing the costs of those misdeeds—effectively she will subsidize the County whose sheriff violated her rights." *Id*. at 10. And all because the sheriff's sexual assault was supposedly perpetrated to advance a "private agenda." *Id*.

7

**II.    This Court Should Reject the Antiquated and Pernicious Notion that Sexual Violence Is a Private Matter.**

Because the district court's decision relies so squarely on the assertion that sexual violence is private, this court must confront and reject that notion head on. An examination of the history of sexual violence makes clear that this notion has no place in modern law. And this is all the more true when applied to the prison context. Our law places an affirmative duty on prison officials to care for, and prevent the assault of, incarcerated people—a duty that is especially salient for officers like Sheriff Hanna who are the final policymakers for the county's law enforcement operations. To construe sexual violence inflicted by a sheriff on an incarcerated individual as "private" or "personal" is completely out of step with that duty.

**a.    Construing Sexual Violence as a Private Matter Is Contrary to Modern Law.**

The idea that sexual violence is private in nature—and therefore outside the realm of legal liability—is not new. Historically, the logic of "privacy" has been invoked as pretext to shield perpetrators of domestic abuse. In the American legal system, "privacy talk was deployed in the domestic violence context to enforce and preserve authority relations between man and wife." *See* Reva B. Siegel, *"The Rule of Love": Wife Beating as Prerogative and Privacy*, 105 Yale L.J. 2117, 2158 (1996). "[T]o preserve the home as a private repose, the law refused to intervene when husbands committed domestic violence against their wives." Susan Hazeldean,

*Privacy as Pretext*, 104 Cornell L. Rev. 1719, 1725-26 (2019) (surveying "the historical use of privacy as a pretext for discrimination against women").

This history is well documented. *See, e.g.*, Jessica Klarfeld, *A Striking Disconnect: Marital Rape Law's Failure to Keep Up with Domestic Violence Law*, 48 Am. Crim. L. Rev. 1819, 1826 (2011) (explaining how "the preservation of marital privacy" was used to justify "the marital rape exemption" which "required that the law stay out of the relationship between husband and wife"); Emily J. Sack, *Is Domestic Violence a Crime?: Intimate Partner Rape as Allegory*, 24 St. John's J. Legal Comment. 535, 551-52 (2010); Jeannie Suk, *Criminal Law Comes Home*, 116 Yale L.J. 2, 11-13 (2006); Katherine M. Schelong, *Domestic Violence and the State: Responses to and Rationales for Spousal Battering, Marital Rape & Stalking*, 78 Marq. L. Rev. 79, 114 (1994) (noting that the states often claimed to foster marital harmony and intimacy by protecting the privacy of the marital relationship). The bottom line is that, rather than protecting women, "concepts of privacy permit, encourage, and reinforce violence against women," and as a result, "male battering of women was untouched by law, protected as party of the private sphere of family life." Elizabeth M. Schneider, *The Violence of Privacy*, 23 Conn. L. Rev. 973, 974 (1991).

The logic of "marital privacy" as a means of insulating domestic abuse from legal intervention faced resounding repudiation by federal and state lawmakers in

the late-twentieth century. "Beginning in the early 1990s, state legislatures introduced law reforms targeting domestic violence" which "changed the nature of domestic violence by treating it as a crime instead of an intrafamilial private dispute." Klarfeld, *supra*, at 1821. The federal government acted as well. "Concerned that states had historically failed to provide women adequate protection from violent, sexualized assault, and that little protection was provided by existing anti-bias crime laws," Congress enacted the Violence Against Women Act "to provide resources to local authorities attempting to combat the types of violence women commonly suffer—in particular, assaults by spouses or other intimate partners and acts of rape." Siegel, *supra,* at 2196.

The district court's reasoning below revives the discriminatory logic that existed prior to these reforms, extending the "private sphere" into the prison context. But "[w]hen courts fail to respond to violence against women, whether in the home or in prison, they effectively 'privatize' it, removing it from the public realm: judicial silence is permissive, implicitly condoning the existing violence and encouraging its perpetuation." Kim Shayo Buchanan, *Beyond Modesty: Privacy in Prison and the Risk of Sexual Abuse*, 88 Marq. L. Rev. 751, 754 (2005) (footnote and internal quotation marks omitted).

10

### b. Sexual Violence Is a Particularly Public Matter In Arenas of Public Trust, Such as in Prisons and Jails.

The failure to respond to sexual violence in prisons as a public matter is especially disturbing in the prison context. Like in the domestic violence context, state and federal lawmakers have implemented legal regimes to combat sexual violence in correctional facilities. For instance, in 2003, Congress enacted the Prison Rape Elimination Act requiring state correctional systems to "regulate and reduce staff-on-inmate sexual misconduct in state correctional facilities." Melissa A. Kowalski et al., *An Analysis of Statutes Criminalizing Correctional Officer Sexual Misconduct with Inmates*, 100 Prison J. 126, 126 (2020). And all 50 states have enacted statutes designed to protect incarcerated persons from being sexual assaulted by prison and jail officials. *See generally id*. Indeed, Colorado state law criminalizes all sexual contact between employees of correctional facilities and persons in custody. *See* Colo. Rev. Stat. § 18-7-701.

These legislative schemes make clear that prison and jail officials like Sheriff Hanna, who act on behalf of the county, have an affirmative and *public* duty of care to incarcerated persons. When officials like Sheriff Hanna sexually assault incarcerated individuals, they "abuse their positions of trust and fail to humanely care for those in their custody." Press Release, Dep't of Justice, *Two More Dublin Federal Correctional Officers to Plead Guilty to Sexually Abusing Multiple Female Inmates* (July 14, 2023), https://www.justice.gov/usao-ndca/pr/two-more-dublin-

11

federal-correctional-officers-plead-guilty-sexually-abusing-multiple. This public duty is constitutional in nature. The Supreme Court has held that the Eighth Amendment "imposes duties on [prison] officials, who must provide humane conditions of confinement" and "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). This mandate to ensure safety extends to pre-trial detainees as well. *See Kingsley v. Hendrickson*, 576 U.S. 389 (2015).

Prison and jail officials' duty of care includes an obligation to protect incarcerated persons from violence—including sexual assault. The Supreme Court has emphasized that "[p]rison conditions may be restrictive and even harsh, but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective, any more than it squares with evolving standards of decency." *Farmer*, 511 U.S. at 833 (internal quotation marks omitted). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Id*. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

This Court has repeatedly affirmed this principle: "[I]t is … clearly established that state officials ha[ve] a duty to protect individuals whom they had taken involuntarily into their physical custody and control." *Liebson v. N.M. Corr.*

*Dep't*, 73 F.3d 274, 277 (10th Cir. 1996). This duty requires officials to "protect prisoners from violence at the hands of other prisoners." *Verdecia v. Adams*, 327 F.3d 1171, 1175 (10th Cir. 2003) (quotation marks omitted); *see also Ramos v. Lamm*, 639 F.2d 559, 572 (10th Cir. 1980) (same); *Allen v. Zavaras*, 430 F. App'x 709, 711 (10th Cir. 2011) (same). And, crucially, to protect prisoners "from attack by prison guards." *Hovater v. Robinson*, 1 F.3d 1063, 1068 (10th Cir. 1993); *see also Keith v. Koerner*, 843 F.3d 833, 837 (10th Cir. 2016) (same).

This public duty of care stems from the unique vulnerability of incarcerated persons—and the significant power that prison officials wield over them. "[H]aving stripped [incarcerated persons] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer*, 511 U.S. at 833. In this case, Sheriff Hanna used his final policymaking authority to exploit that vulnerability. Even the court below could not dispute that "Mr. Hanna's position of power was an enabling factor in his assault on Ms. Biggs." March 2023 Op. at 9. As the official with final authority over detainee supervision and, in this case, the transportation of Ms. Biggs between facilities, Sheriff Hanna had a unique obligation to keep Ms. Biggs safe. Thus, the district court erred in its characterization of the assault as a mere "private" act—it was an egregious violation of Sheriff Hanna's *public* duty to protect Ms. Biggs, enabled by his significant *public* authority and power as a sheriff.

13

III.    **When Properly Construed as an Exercise of Power, Sexual Violence Fits Within the Requirements of *Monell* Liability.**

Sheriff Hanna's actions as a final policymaker are sufficient to establish municipal liability. In *Monell v. Department of Social Services*, the Supreme Court noted that the conduct of officials "whose edicts or acts may fairly be said to represent official policy" can give rise to municipal liability under § 1983. 436 U.S. 658, 694 (1978). Then, in *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), the Court clarified its earlier holding, explaining that "actions taken by a municipality's final policymakers also represents acts of 'official policy' giving rise to municipal liability." *Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281, 1285 (10th Cir. 2007) (citing *Pembaur*, 475 U.S. at 481). Thus, municipalities are subject to *Monell* liability for actions performed by final policymakers.

The Court in *Pembaur* offered additional guidance about when municipal liability for the conduct of final policymakers exists. It provided that liability attaches when a municipal officer is "responsible for establishing final policy with respect to the subject matter in question" and makes "a deliberate choice to follow a course of action … from among various alternatives." *Pembaur*, 475 U.S. at 483-84; *see also Starrett v. Wadley*, 876 F.2d 808, 818 (10th Cir. 1989) ("[I]f a county official has been delegated the power to make final policy in an area of the county's business, then the official's acts in that area are the acts of the county." (emphasis omitted)). The *Pembaur* Court also specified that circumstances in question need not

14

involve a pattern of conduct—"it is plain that municipal liability may be imposed for a *single* decision by municipal policymakers." *Pembaur*, 475 U.S. at 480.

Sheriff Hanna is a final policymaker "with respect to the subject matter in question." *Id.* at 483-84. It is undisputed that he was the final policymaker with respect to law enforcement, jail operations, the supervision of detainees in custody, and the transportation of detainees between jails. And it was in the course of exercising that policymaking authority that Sheriff Hanna falsely imprisoned and sexually assaulted Ms. Biggs.

The district court's decision to dismiss these acts as "private rather than official" and "advancing a purely personal agenda," March 2023 Op. at 9 & n.6 (quotation marks omitted), not only fails to appreciate the profoundly public nature of Sheriff Hanna's conduct; it also renders municipal liability for constitutional violations in the prison context unworkable. The fact that Sheriff Hanna acted with selfish motives cannot be legally relevant. Broad application of such a rule— distinguishing strictly between personal and public agendas—would shield municipalities from liability for every act of excessive force that was driven by personal motive. Consider, for instance, a sheriff who authorizes prison guards to physically assault an inmate with whom he has a *personal* feud. Or a sheriff who refuses to protect an inmate from harm, as a matter of policy, based on a *personal* vendetta. The law does not shield municipalities from liability simply because their

15

final policymakers act with selfish motives. *See, e.g.*, *Bledsoe v. Bd. of Cnty. Comm'rs*, 501 F. Supp. 3d 1059 (D. Kan. 2020) (finding municipal liability for a broad conspiracy led by sheriff as final policymaker to frame plaintiff for murder that arose when a county prosecutor owed the suspect's lawyer a favor), *aff'd in part, rev'd in part sub nom. Bledsoe v. Carreno*, 53 F.4th 589 (10th Cir. 2022); *Patrick v. City of Overland Park,* 937 F. Supp. 1491 (D. Kan. 1996) (finding municipal liability for city in suit involving a police chief as final policymaker investigating potential political enemies).

To its credit, the district court even acknowledged that "[t]he plaintiff's argument that an elected sheriff's actions in carrying out duties like prisoner transport should be treated as official policy and thus held against the Entity Defendants again holds some appeal and is not without some persuasive legal authority." March 2023 Op. at 7 (citing *Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir. 1996), among other cases). In *Bennett*, the Fifth Circuit found that a sheriff's rape of a suspect during an attempted-murder investigation gave rise to county liability. *Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir. 1996). The court reasoned that "the Sheriff's actions were those of the County because his relationship with [suspect] grew out of the attempted murder investigation and because … he used his authority over the investigation to coerce sex with her." *Id*.; *see also id*. at 586 n.5 (noting "the Sheriff's use of his power to place himself in a position to rape [suspect]"). The court

16

was also careful to note that "[t]he fact that rape is not a legitimate law enforcement goal does not prevent the Sheriff's act from falling within his law enforcement function." *Id*. at 586.

This Court should embrace the same reasoning in this case. The fact that Sheriff Hanna's assault of Ms. Biggs did not advance any public ends does not mean it does not fall within his law enforcement function as a final policymaker. Any so-called "private" or "personal" motive is irrelevant because Sheriff Hanna's use of his public authority and power in his role *as Sheriff* is exactly what placed him in a position to assault Ms. Biggs. That alone is enough to justify municipal liability under *Monell*.

## CONCLUSION

For the foregoing reasons, *amicus curiae* respectfully requests that this Court reverse the district court's dismissal of claims against the County and Sheriff's Department.

DATED: July 24, 2023

/s/ Jessica Ring Amunson
Jessica Ring Amunson
Mary Marshall
JENNER & BLOCK LLP
1099 New York Ave. NY, Suite 900
Washington, D.C. 20001
Tel: (202) 639-6865
jamunson@jenner.com

## CERTIFICATE OF COMPLIANCE WITH WORD VOLUME LIMITATION

This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) because it contains 3,917 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman typeface.

Date: July 24, 2023                  /s/ Jessica Ring Amunson
                                     *Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2023 I electronically filed the foregoing using the court's CM/ECF system which will send notification of such filing to all Defendants-Appellants that have appeared.

Date: July 24, 2023                              /s/ Jessica Ring Amunson
                                                *Counsel for Amici Curiae*

19